[No. B064955. Second Dist., Div. Four. Dec. 22, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES JOHNSON BEY, Defendant and Appellant.

[Opinion certified for partial publication.*]

*The first paragraph of the opinion, part I of the Discussion, and the Disposition are to be published.

## COUNSEL

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

Tricia A. Bigelow and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EPSTEIN, Acting P. J.**—James Johnson Bey appeals from judgment of conviction by jury trial of first degree murder. (Pen. Code, § 187; all further statutory references are to the Penal Code unless otherwise indicated.) He argues that statements he made to police were used to impeach his testimony in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution. We agree, but find the error harmless beyond a reasonable doubt. Appellant raises multiple claims of instructional error. We conclude that the instructions on the use of his statement to the police were adequate, as were the instructions on his other out-of-court statements, and on reasonable doubt. We find a sufficient factual basis for the jury instructions on appellant's failure to explain evidence against him and on adoptive admissions. We find no basis for reversal in appellant's claims of misconduct by two witnesses and by the prosecutor. Finally, we modify appellant's sentence to reflect one less day of presentence credit to correct a miscalculation.

### FACTUAL AND PROCEDURAL SUMMARY*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISCUSSION

### I

### *Appellant's Statements to the Police*

■ Appellant argues that the trial court erred in allowing the introduction of a statement he made to police officers to impeach his testimony. He contends that the statement was introduced in violation of his Fifth and Fourteenth Amendment rights because it was not made voluntarily and because there was no knowing and voluntary waiver of the right to counsel guaranteed by the Fifth Amendment. We agree that appellant's rights were violated, but conclude that the error was harmless in light of the overwhelming evidence of appellant's guilt.

---

*See footnote, *ante*, page 1623.

"Under the familiar requirements of *Miranda*, [*Miranda* v. *Arizona* (1966) 384 U.S. 436 (16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974)] designed to assure protection of the federal Constitution's Fifth Amendment privilege against self-incrimination under 'inherently coercive' circumstances, a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent. [Citations.] Once having invoked these rights, the accused 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.' (*Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 385-386, 101 S.Ct. 1880].) The initiation of further dialogue by the accused, however, does not in itself justify reinterrogation. [Citation.] '[E]ven if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.' [Citation.]" (*People* v. *Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

Appellant was arrested on March 6, 1991, at 2 in the afternoon and brought to the Los Angeles Police Department's South Bureau. There is no holding tank at that facility and the policy is to handcuff prisoners by one hand to a bench. At 6 p.m. the same day, the detectives concluded the scientific investigation of appellant's apartment and returned to the South Bureau to interrogate him. Appellant was led into an interview room, accompanied by two detectives. He was not handcuffed. The interview lasted 15 minutes.

Detective Bennett began the interrogation before advising appellant of his *Miranda* rights. After obtaining appellant's name, address, and vital statistics, Detective Bennett asked appellant if he knew why he was there. Appellant responded that he had an idea—that he was a suspect in the murder of a woman who had been in his house. Appellant stated that she had left his house alive. In response to questions from the detective, appellant said that the victim had come to his house with a man named "Gary."

At that point, Detective Bennett asked Detective Crosby: "Before we go any further, you want to advise him?" Appellant was given his *Miranda* rights and asked whether he wished to give up the right to remain silent. The following exchange then occurred: "[Appellant]: Am I being charged with murder? If I'm being charged with murder, then I won't have another word

to say until I have an attorney. [¶] [Detective Bennett]: Is that . . . your feelings? Do you—That's why I questioned you, do you wish to—[¶] [Appellant]: [unintelligible] if you read me those rights, you must be gonna charge me with something. So I'll wait and see what happens. I won't say another word until I have an attorney. [¶] [Detective Bennett]: Well, like you say yourself, James, you're a suspect. [¶] [Appellant]: Well, if I'm being charged with something, I'd rather not have anything else to say until I have an attorney. [¶] [Detective Bennett]: Okay? [¶] Let me explain something to you, James. I'm going to continue to ask you questions. Now, you realize that you didn't waive your rights. That means we can't use 'em in court. [¶] [Detective Crosby]: I think James is familiar with out [unintelligible] outside Miranda. Are you familiar with that, James? [¶] [Appellant] I don't—I don't know too much about the law. I'm just telling you I know to keep my mouth shut [unintelligible] somebody to put me in jail."

The detectives then told appellant that they had found incriminating physical evidence in his apartment. He responded that he would not say anything without his attorney. Detective Bennett followed this statement by asking "Why don't you tell me what happened that night?" In response to numerous questions from the detectives, appellant went on to give an account of the events on the night of the murder which was inconsistent in some respects with his testimony at trial. Appellant never confessed to the murder.

At trial, outside the presence of the jury, Detective Bennett testified that he had continued to question appellant "[s]o that if he did take the stand, his testimony could be impeached." Appellant's attorney asked: "Have you attended any seminars where it was suggested as a tactic to keep asking questions to a suspect after they invoke their rights?" Detective Bennett answered "Yes." He explained that the substance of what he was told at the seminar was: "In essence, you do want to get a statement for the expressed purpose that I just stated."

■ It is apparent that Detective Bennett was attempting to capitalize on the rule stated in *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], which allows the use of statements taken in violation of the prophylactic *Miranda* rules to impeach conflicting testimony by the defendant, even though the statements are not admissible in the prosecution's case-in-chief. (*Id.* at pp. 224-225 [28 L.Ed.2d at pp. 3-4]; see also *Michigan* v. *Harvey* (1990) 494 U.S. 344, 350-351 [108 L.Ed.2d 293, 302-303, 110 S.Ct. 1176]; *People* v. *May* (1988) 44 Cal.3d 309, 315, 318-319 [243 Cal.Rptr. 369, 748 P.2d 307].) Apparently this is not a new tactic. (See *People* v. *Baker* (1990) 220 Cal.App.3d 574, 576 [269 Cal.Rptr. 475].) But if the

accused's statements are involuntary, the Supreme Court has mandated the exclusion of such evidence for *all* purposes, including impeachment. (See *Michigan* v. *Harvey*, *supra*, 494 U.S. at p. 351 [108 L.Ed.2d at pp. 302-303].)

 This is a very troubling case, presenting a deliberate police violation of *Miranda* coupled with a misrepresentation to appellant about the legal consequences of that violation. In *People* v. *Cahill* (1993) 5 Cal.4th 478 [20 Cal.Rptr.2d 582, 853 P.2d 1037], the California Supreme Court recently reiterated the fundamental policy prohibiting such conduct: "Nothing in this opinion should be misinterpreted to suggest that California law permits or tolerates the coercion of a confession from a suspect in a criminal case. . . . [C]oercive conduct by any law enforcement officer that results in an involuntary confession is unquestionably intolerable and unconstitutional. . . . [T]he rule remains clear that when a trial court finds a confession has been obtained by improper means that render it 'involuntary' or 'coerced,' the confession must be excluded from evidence at trial." (*Id.* at pp. 510-511.)

The superior court held that appellant's statement was voluntary, but expressed misgivings: "I happen to share the opinion of the court that is not thrilled to hear that officer, after Miranda rights are invoked, continue to question someone. [¶] Because I think it violates one of the principles that I thought was laid out originally in Miranda. [¶] But it is not a violation of law and one must look to see if these other factors apply to determine whether or not such a statement may be used in impeaching the defendant."

We exercise independent review of the uncontradicted evidence (*People* v. *Sims*, *supra*, 5 Cal.4th at p. 440) and are compelled to conclude that under these circumstances, appellant's statements were coerced and involuntary, and should not have been introduced to impeach his trial testimony. The fact that he did not actually confess to the crime does not change the result. His statements were the product of illegal police coercion. We turn to the question of whether this error was harmless.

The consequences of the erroneous admission of an involuntary statement in violation of the accused's rights has evolved significantly in the last two years. As the California Supreme Court explained in *People* v. *Sims*, *supra*, 5 Cal.4th 405: "Prior to the decision in *Arizona* v. *Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246], both the United States Supreme Court and this court held that the erroneous admission of an involuntary confession required the automatic reversal of the defendant's conviction. [Citations.] In *Fulminante*, however, the United States Supreme Court held that a federal constitutional 'trial error' such as the admission of an involuntary confession does not automatically require reversal of the conviction,

but is subject to the harmless-error analysis set forth in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. . . . In *People* v. *Cahill, post,* [5 Cal.4th at page 478], we reconsidered the California reversible-per-se rule (which had corresponded to the previous federal rule), concluding the erroneous admission of an involuntary confession does not require automatic reversal under the state Constitution, independently of federal law. (*Id.* at pp. 531-541.) We recognized that when a confession has been obtained by means that render it inadmissible under the federal Constitution, the prejudicial effect of its admission in evidence must be determined under the federal *Chapman* standard of whether the error was harmless beyond a reasonable doubt. [Citation.]" (*Id.* at p. 447.) The line of cases that had held such error to be per se reversible was overruled. (*People* v. *Cahill, supra,* 5 Cal.4th at p. 509.)

The evidence of appellant's guilt was overwhelming. Appellant admitted that Ms. Smith died in his apartment, that he disposed of her body, and that he attempted to clean her blood from his apartment. His explanation that she was murdered by another person while he slept was inherently improbable in light of the evidence of the extensive trauma to the victim's body and the blood found on his bed. He admitted that the victim had stolen money from him on three previous occasions when he had asked her to purchase drugs for him. This made him angry and upset. The two had another dispute over the amount of drugs which Ms. Smith obtained for appellant on the night of the murder. After the murder, appellant made inconsistent statements to the victim's father. Eyewitnesses saw the victim with appellant on the night of the murder, saw him dispose of her body, and saw bloodstains and other physical evidence of the murder in his apartment.

The statement used to impeach appellant was not a confession. Instead, it was merely inconsistent with his trial testimony in some respects. As we have seen, there was significant independent evidence which severely compromised appellant's testimony about the circumstances of Ms. Smith's death. We are satisfied, beyond a reasonable doubt, that the impeachment of appellant with his statements to the police was not prejudicial under the peculiar facts of this case.

II-IV*

. . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1623.

## DISPOSITION

The sentence is modified to reflect 136 days of conduct credit rather than 137 days of credit. As modified, the judgment is affirmed.

Vogel (C. S.), J., and Hastings, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 23, 1994.