**CALIFORNIA ATTORNEYS FOR CRIMINAL JUSTICE, et al.,**
Plaintiffs,

v.

**James BUTTS, et al., Defendants.**

No. CV 95–8634–ER(JGx).

United States District Court,
C.D. California.

April 10, 1996.

Charles D. Weisselberg, Los Angeles, CA, Mark D. Rosenbaum, ACLU Foundation of So. Calif., Los Angeles, CA, William J. Genego, Jr., Santa Monica, CA, for California Attorneys for Criminal Justice.

Jeanette Schachtner, Santa Monica, CA, for James Butts.

Frederick N. Merkin, Los Angeles City Attorney, Los Angeles, CA, Debra Lynn Gonzalez, Deputy City Attorney, Los Angeles, CA, for Willie L. Williams.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

RAFEEDIE, District Judge.

### Introduction

Plaintiffs in this case charge that local police departments systematically and intentionally violate the *Miranda* rights of criminal defendants by ignoring invocations of the right to remain silent and the right to counsel. Defendants, who are police chiefs, individual detectives, and the cities of Los Angeles and Santa Monica, have moved to dismiss under Fed.R.Civ.P. 12(b)(6) on the grounds that the associational plaintiffs lack standing to bring this action, and that the individual plaintiffs fail to state causes of action under 42 U.S.C. § 1983. The Court has read and considered the papers filed by the parties in this matter, and has had the benefit of oral argument by counsel. For the reasons set forth below, the Court grants the motion to dismiss as to the associational plaintiffs but denies the motion as to the individual plaintiffs.

### Facts

Plaintiffs are James McNally and James Johnson Bey, individuals; and California Attorneys for Criminal Justice ("CACJ") and Criminal Courts Bar Association ("CCBA"), non-profit California corporations consisting of criminal defense attorneys.

Defendants are the cities of Santa Monica and Los Angeles; James Butts, police chief of Santa Monica; Willie Williams, police chief of Los Angeles; Ray Cooper and Shane Talbot, Santa Monica police detectives; and Raymond Bennett and Michael Crosby, Los Angeles police detectives.

McNally was arrested in Arizona, brought to Santa Monica on suspicion of murder, and interrogated by Cooper and Talbot on March 3, 1993. He claims that after being read his *Miranda* rights, he invoked his right to remain silent and his right to the presence of counsel. Cooper and Talbot acknowledged that he had invoked these rights but allegedly told him, "I don't trust anything that anybody tells me after they've talked to an attorney and the D.A. that will be working

with us on this case doesn't either." The detectives also allegedly stated, "I don't care about [your attorney] anymore.... As far as I'm concerned, you know, they really mess up the system." Finally, the detectives allegedly told him that nothing he said could be used against him. (Complaint ¶ 22). McNally was subsequently convicted of manslaughter and is currently in state prison.

Bey was arrested on March 6, 1991, by Los Angeles police officers on suspicion of murder. He claims that Bennett and Crosby continued to question him, even after he invoked his right to remain silent and his right to an attorney. They allegedly told him that nothing he said could be used against him. (Complaint ¶ 23). Bey was subsequently convicted of murder and is presently in state prison.[1]

Plaintiffs also allege that the police chiefs and the cities not only failed to educate the police detectives adequately with respect to the Fifth, Sixth and Fourteenth Amendment rights of criminal suspects, but also encouraged the practices described above.

According to Plaintiffs, the purpose of this policy of ignoring the assertion of *Miranda* rights is to obtain evidence that, while inadmissible for use in the prosecution's case in chief, may be admitted for impeachment purposes.[2] Plaintiffs allege that police officers expect that once a suspect asserts his right to remain silent and requests an attorney, that suspect will not provide anymore useful evidence to the police. Hence, the police have nothing to lose by continuing to question suspects, and they may gain impeachment evidence.

Bey and McNally seek damages for the injuries they suffered during interrogation and for the violation of their Fifth, Sixth and Fourteenth Amendment rights. CACJ and CCBA seek:

(1) a declaration that the practices of the Los Angeles and Santa Monica Police Department are unconstitutional;

(2) a permanent injunction against the practices of ignoring the invocation of *Miranda* rights and/or the right to counsel;

(3) a permanent injunction requiring the retraining of all officers regarding the requirements of *Miranda* and *Edwards;*

(4) a permanent injunction requiring that the Los Angeles and Santa Monica police officers question suspects only in the presence of counsel, until the Court is satisfied that the requested retraining has occurred.

### Discussion[3]

■ Under Fed.R.Civ.P. 12(b)(6), the Court takes the factual allegations in the complaint to be true for the purposes of testing the sufficiency of the pleading. *Buckey v. County of Los Angeles,* 968 F.2d 791, 794 (9th Cir.), *cert. denied,* 506 U.S. 999, 113 S.Ct. 599, 600, 121 L.Ed.2d 536 (1992).[4]

### I. Associational Plaintiffs (Lack of Standing)

The defendants argue that all plaintiffs in this matter lack standing to bring the claims for injunctive relief. The Court notes, however, that Plaintiffs McNally and Bey are not seeking injunctive relief, only damages.[5]

1. Although not relevant to this motion, these statements given by Bey after the invocation of his *Miranda* rights were indeed used to impeach him. *People v. Bey,* 21 Cal.App.4th 1623, 1625, 27 Cal.Rptr.2d 28 (1993).

2. *Harris v. New York,* 401 U.S. 222, 224–25, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971).

3. There are two separate motions to dismiss, one by the Los Angeles defendants (Los Angeles, Williams, Bennett and Crosby) and one by the Santa Monica defendants (Santa Monica, Butts, Cooper and Talbot). However, they raise the same grounds for dismissal, and since the relevant facts are identical, the Court has treated them as one motion.

4. Plaintiffs attach a document purporting to be an official memorandum from police chief Butts concerning questioning "outside *Miranda.*" The Court has not considered this document, as it is extrinsic evidence not proper for consideration under Rule 12(b)(6), and in any case, Plaintiffs have sufficiently alleged a practice, policy or custom without reference to it.

5. Bey and McNally concede that *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), prevents them from seeking injunctive relief. In *Lyons,* the Supreme Court held that a plaintiff lacked standing to seek injunctive relief "where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Id.* at 111, 103 S.Ct. at 1670.

Thus, the standing issue concerns only Plaintiffs CACJ and CCBA.

Standing is a threshold inquiry that derives from the Article III "Case or Controversy" requirement. In the absence of a plaintiff with standing, a federal court lacks subject-matter jurisdiction to hear cases. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). Constitutional standing consists of three elements: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) redressability. There is a separate inquiry, known as prudential standing, which is aimed at determining whether the plaintiff is the proper party to bring the lawsuit. *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976).

### A. Direct Standing

CACJ and CCBA argue that they are directly injured by the alleged practice, as it interferes with the attorney-client relationship. In *U.S. Dept. of Labor v. Triplett,* 494 U.S. 715, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990), the Supreme Court held that:

> When ... enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist.

*Id.* at 720, 110 S.Ct. at 1432. In *Triplett,* the restriction was a prohibition on the receipt of attorneys' fees for attorneys who represent claimants seeking so-called "Black Lung" benefits from the Department of Labor. A successful claimant's attorney would be entitled to "reasonable" attorneys' fees from the claimant's employer or insurer, but not from the claimant. The Supreme Court concluded that this restriction interfered with claimants' due process right to procure legal representation, thereby hindering them from entering into attorney-client relationships. *Id.* By implication, the restriction made it less likely that attorneys would be able to secure employment.

Similarly, in *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989), the Supreme Court held that a law firm had standing to advance its client's claimed Sixth Amendment right to spend drug trafficking profits on legal representation. The Supreme Court noted that the law firm would undoubtedly suffer an injury in fact in this matter, as it had a concrete stake in the $170,000 of forfeited assets.

*Triplett* and *Caplin & Drysdale* are, however, significantly different from this case. Both of those cases involved concrete restrictions on legal fees that impaired the ability of clients to hire attorneys and the willingness of attorneys to represent clients. Thus, the restrictions had a direct effect on the supply and demand of attorneys. In this case, however, there is no such restriction. Even if the police departments are violating the *Miranda* rights of suspects, CACJ and CCBA have not alleged that they are being prevented from representing the suspects eventually.

Plaintiffs CACJ and CCBA rely on *Wounded Knee Legal Defense/Offense Committee v. FBI,* 507 F.2d 1281 (8th Cir.1974), for the proposition that:

> [A] lawyer has standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel.

*Id.* at 1284. Thus, CACJ and CCBA argue that the alleged practice impairs their ability to represent clients, who may have given damaging testimony to the police before the attorneys are allowed to see them. However, in *Wounded Knee,* the plaintiff attorneys were themselves the victims of the allegedly unconstitutional actions. In this case, on the other hand, it is the potential clients of the plaintiffs who are the victims of the allegedly unconstitutional actions.

More importantly, the law in the Ninth Circuit differs. *Portman v. County of Santa Clara,* 995 F.2d 898 (9th Cir.1993), held that a public defender did not have direct standing to challenge, on Sixth Amendment

grounds, a Santa Clara County regulation requiring that the Public Defender serve at the will of the Board of Supervisors. *Id.* at 902. The asserted injury was that the Board could "direct the manner in which the public defender discharges his or her duties, which in turn interferes with the public defender's ability to provide his or her clients with the effective assistance of counsel." *Id.* The Ninth Circuit rejected this injury, because the public defender failed to show that the Sixth Amendment conferred rights upon him directly. *Id. Portman* noted that "[n]o court ... has ever held that the Sixth Amendment protects the rights of anyone other than criminal defendants." *Id.*

Nor can Plaintiffs CACJ or CCBA show direct standing based on the alleged *Miranda* violations of criminal suspects, because the Fifth Amendment right against self-incrimination is also personal to the criminal defendant. *Communist Party of United States v. Subversive Activities Control Board,* 367 U.S. 1, 107, 81 S.Ct. 1357, 1416, 6 L.Ed.2d 625 (1961).

At oral argument, Plaintiffs CACJ and CCBA raised another injury: because criminal defense attorneys typically take cases on a flat fee basis, the alleged practice complained of in this matter forces them to bring additional motions to suppress, which adds to the total work they must undertake per case, thereby lowering their effective hourly wage.

■ This argument, while creative, ultimately fails, because the injury stated is not cognizable as an injury for Article III purposes. Defense attorneys could simply charge a higher flat fee to take into account the additional motions they must file. *See Sierra Club v. Marita,* 46 F.3d 606, 612–13 (7th Cir.1995) (discussing the lack of imminent harm in *Lujan* as hinging partly on the fact that "the acts necessary to make the injury happen ... [were] at least partly within the plaintiffs['] own control"); *Animal Legal Defense Fund, Inc. v. Espy,* 29 F.3d 720, 725 (D.C.Cir.1994) (discussing same aspect of

*Lujan* ). Admittedly, in these cases, there was no standing due to the lack of imminence of injury, since the harms were "couched in language of uncertainty and futurity." *Animal Legal Defense Fund,* 29 F.3d at 725. However, the underlying theme of these cases is that the plaintiff's injuries must be caused by actions of a defendant, and not those of the plaintiff or third parties. *See Yesler Terrace Community v. Cisneros,* 37 F.3d 442, 447 (9th Cir.1994) (discussing *Lujan* and the fact that standing based on actions by third parties requires a tight nexus between the action and the injury).

Under Plaintiffs' theory of injury, the plaintiff in *Animal Legal Defense Fund* would have had standing to pursue his claim. In that case, the plaintiff was a research scientist who sought to challenge U.S. Department of Agriculture regulations concerning the humane treatment of laboratory animals. In particular, the regulations required laboratory facilities to promulgate their own procedures for complying with the requirements of the Act authorizing the regulations. 29 F.3d at 722. The plaintiff claimed that the vagueness of the regulations prevented him from formulating a plan for his research institute. *Id.* at 725. Under the theory advanced here, the plaintiff could have asserted an injury based on the fact that the uncertainty regarding the regulations would lead him to formulate an excessively detailed plan that would cause him to spend less time conducting research, and thereby lead to a net loss of efficiency in use of research funds. Yet, *Animal Legal Defense Fund* saw the plaintiff's asserted injuries as too remote.

The Court therefore concludes that neither CACJ nor CCBA possesses direct standing to assert the claims in this complaint.

### B. Third Party Standing

■ The next inquiry is whether CACJ and CCBA can assert, as third parties, the rights of criminal defendants.[6] A plaintiff

---

6. Admittedly, the law appears to be somewhat contradictory on this issue. *Caplin & Drysdale* suggests that the failure to establish an injury in fact to the litigant ends the inquiry. *See id.* at 623 n. 3, 109 S.Ct. at 2651 n. 3 ("[H]as the litigant suffered some injury-in-fact, adequate to satisfy Article III's case or controversy requirement").

However, a long line of other cases suggests that third party standing is a substitute for direct

typically lacks standing to assert the rights of others. *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953); *Tileston v. Ullman*, 318 U.S. 44, 46, 63 S.Ct. 493, 494, 87 L.Ed. 603 (1943) (per curiam). However, this rule is "not constitutionally mandated, but rather stem[s] from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig v. Boren*, 429 U.S. 190, 193, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976).[7]

The determination as to whether third party standing is allowed is made by examining three factors: (1) "the relationship of the litigant to the person whose rights are being asserted;" (2) "the ability of the person to advance his own rights;" and (3) "the impact of the litigation on third-party interests." *Caplin & Drysdale*, 491 U.S. at 623 n. 3, 109 S.Ct. at 2651 n. 3.

The first factor weighs in favor of finding standing, as the Supreme Court has noted that the attorney-client relationship "is one of special consequence." *Id.* However, while this factor weighs in favor of finding standing, it is not particularly strong, because the attorney-client relationship is prospective only and not definite.

The second factor weighs against finding standing, as a criminal defendant "suffers none of the obstacles" typically involved in cases with third party standing. *Id.* In *Craig*, for example, the Supreme Court noted that underage males would probably not as-

sert their constitutional right to be treated equally as females, for fear of being prosecuted. In effect, they would chill themselves. Similarly, in the doctor-patient cases, the patients might not have challenged the constitutionality of the statutes for the same fear of being prosecuted.[8]

A criminal defendant, however, is in no jeopardy of suffering additional prosecution as a result of an assertion that his Fifth and Sixth Amendment rights have been violated. If his rights have been violated, he is free to seek to suppress the evidence obtained as a result of those violations, and he may also be able to file his own § 1983 action against those who deprived him of his civil rights.

CACJ and CCBA rely on *Ward v. City of Portland*, 857 F.2d 1373 (9th Cir.1988). In *Ward*, the Portland police department required officers involved in fatal shootings to submit written reports prior to consulting with counsel, and a police officers' association was allowed to assert the claim on behalf of police officers. *Ward* involved not standing, but ripeness and mootness. Because those doctrines are interrelated with standing, however, *Ward* may be applicable to this case.

Nevertheless, the central difference between *Ward* and this case is that in *Ward*, absent a suit by the association seeking injunctive relief, there would be no way for the victims of the allegedly unconstitutional practice to protect their rights. The Ninth Circuit noted that the controversy was "capable of repetition, yet evading review." *Id.* at

standing. For example, in *Portman*, the Ninth Circuit, after concluding that the public defender lacked direct standing, considered whether he had third party standing. The court ultimately resolved the matter on ripeness grounds, but noted that it "express[ed] no view as to whether a public defender would have standing to assert the rights of his clients if the clients' claims were ripe." 995 F.2d at 904.

**7.** In *Craig*, the Supreme Court also held that the vendor had direct standing. However, unlike in this case, the vendor in *Craig* had to obey the challenged the statute (which prohibited the sale of a certain type of beer to males under 21, but allowed sales to females over 18), or risk prosecution. Similarly, in the long line of cases involving doctors asserting the rights of their patients, the doctors were also in jeopardy of being prosecuted. *Doe v. Bolton*, 410 U.S. 179, 188, 93

S.Ct. 739, 35 L.Ed.2d 201 (1973); *Eisenstadt v. Baird*, 405 U.S. 438, 443–46, 92 S.Ct. 1029, 1033–35, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 481, 85 S.Ct. 1678, 1679–80, 14 L.Ed.2d 510 (1965). In this case, however, the alleged unconstitutional practices of the police departments do not place CACJ and CCBA in any kind of jeopardy of being prosecuted.

**8.** To some extent, the requirement that the males in *Craig* or the patients in the doctor cases actually commit the act prohibited stems from the Supreme Court's ripeness doctrine. *See, e.g., United Public Workers v. Mitchell*, 330 U.S. 75, 89–90, 67 S.Ct. 556, 564–65, 91 L.Ed. 754 (1947) (requiring actual acts in violation of Hatch Act in order to challenge the Act's constitutionality).

1375–76. In this case, however, the alleged unconstitutional practice may be capable of repetition, but not of evading review, because criminal defendants can assert their own rights.

Finally, the third factor weighs against finding standing as well. In *Caplin & Drysdale,* the Supreme Court concluded that a statute that prohibited defendants from using forfeited proceeds to pay for legal representation would "materially impair the ability of" defendants from exercising their constitutional rights. In this case, however, even if the police departments are systematically violating the Fifth and Sixth Amendment rights of defendants, criminal defendants are not impaired from exercising their constitutional rights, as discussed earlier.

Accordingly, the Court concludes that CACJ and CCBA also lack third-party standing to maintain claims for injunctive relief. The associational plaintiffs contend that they are the only ones who can seek injunctive relief against the defendants. Even if true, that assertion would not justify the massive structural relief (and attendant burdens on the Court) that they seek in this matter, when individual suits under § 1983 may be as effective, if not more so, at redressing the alleged unconstitutional activities.

## II. Individual Plaintiffs

■ The defendants raise two primary defenses to the claims asserted by Bey and McNally: failure to state a cause of action and qualified immunity.[9]

### A. Failure to State a Cause of Action

■ The defendants first argue that, because *Miranda* rights are merely prophylactic and not constitutional, a violation of those rights does not create a cause of action under

42 U.S.C. § 1983. This argument draws limited support from *Michigan v. Tucker,* 417 U.S. 433, 445, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974).

Taking the allegations in the complaint as true, which the Court must on a motion under Rule 12(b)(6), however, the Court concludes that this case, as pleaded, is controlled by *Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir.1992) (en banc). An extended discussion of *Cooper* is warranted due to the similarities between the facts of that case and the allegations of this one.

Between 1984 and 1986, a wave of rapes, robberies, and kidnappings swept through Tucson, Arizona. Local law enforcement officials suspected that one person was responsible and dubbed that person the "Prime Time Rapist." *Id.* at 1223. To catch the Prime Time Rapist, the Tucson police and Pima County Sheriff's Department formed a Task Force. Before it even had a suspect in mind, the Task Force devised an interrogation plan:

> The core of their plan was to ignore the suspect's Constitutional right to remain silent as well as any request he might make to speak with an attorney in connection therewith, to hold the suspect incommunicado, and to pressure and interrogate him until he confessed. Although the officers knew any confession thus generated would not be admissible in evidence in a prosecutor's case in chief, they hoped it would be admissible for purposes of impeachment if the suspect ever went to trial. They expected that the confession would prevent the suspect from testifying he was innocent, and that it would hinder any possible insanity defense.... With the suspect isolated from the outside world and cut off from his attorney, the plan called for [the

---

9. Defendants also raise a statute of limitations defense. However, Defendants do not press this defense vigorously, as their replies do not address Plaintiffs' arguments.

The statute of limitations for § 1983 actions is to be determined by the statute of limitations law of the state in which the Court sits. *Wilson v. Garcia,* 471 U.S. 261, 268, 105 S.Ct. 1938, 1942–43, 85 L.Ed.2d 254 (1985); *Harding v. Galceran,* 889 F.2d 906, 907 (9th Cir.1989) (one year statute of limitations for district courts in Califor-

nia). Any applicable state tolling law applies to § 1983 actions brought in districts in that state, including statutes that toll the limitations period during a plaintiff's incarceration. *Hardin v. Straub,* 490 U.S. 536, 543, 109 S.Ct. 1998, 2002–03, 104 L.Ed.2d 582 (1989).

Cal.Civil Proc.Code § 352(a)(3) tolls the limitations period while plaintiffs are imprisoned on criminal charges. Both McNally and Bey have been in continuous incarceration, and hence they are not time-barred by the statute of limitations.

interrogator] to overcome the suspect's resistance and extract a confession. *Id.* at 1224–25.

On May 7, 1986, through a mistaken fingerprint match, the Task Force identified Michael Cooper as a suspect. Finding Cooper in the Pima County Probation Department office that afternoon, two detectives interrogated him on the spot. The detective who first advised Cooper of his *Miranda* rights "deliberately turned the advisement into what he hoped Cooper would perceive as a joke." *Id.* at 1228. Cooper asked for his attorney twice, but each request was denied. *Id.* at 1229. Cooper was then arrested formally. He asked for his attorney several more times during a four hour interrogation that the Ninth Circuit described as "sophisticated psychological torture." *Id.* at 1229, 1231, 1248.

On these facts, eight of eleven Ninth Circuit judges sitting en banc held that Cooper stated viable causes of action under § 1983 for violations of Fifth and Fourteenth Amendment rights. *Cooper* explained that there were two keys to understanding the cause of action for the *Miranda* violations: "(1) *Miranda*'s primary holding that the Fifth Amendment right not to be compelled to be a witness against oneself applies in police stations as well as before grand juries and in courtrooms, and (2) [the interrogator]'s statement that the explicit purpose of

his plan was to defy the invocation by an arrested suspect of his right to silence and to make him confess." *Id.* at 1238.

The allegations in this case, taken as true and viewed in a light most favorable to Bey and McNally, are close enough to the facts in *Cooper* to state a cause of action under § 1983. Bey and McNally allege that they asserted their *Miranda* rights to remain silent and to counsel, and that the interrogating officers ignored these assertions of rights and continued to ask them questions. They allege that the police officers did so pursuant to a preformulated plan, hoping to obtain impeachment evidence.[10] Furthermore, they allege that the police detectives informed them that statements they gave after invocations of *Miranda* rights could not be used against them. Given the impeachment exception to the *Miranda* exclusionary rule announced in *Harris v. New York*, 401 U.S. 222, 224–25, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971), such statements are at best ambiguous deception and at worst outright prevarication.[11]

The complaint is silent as to the length and severity of the respective interrogations they endured. However, Bey and McNally allege that they suffered psychological coercion during the interrogations. This allegation is sufficient to survive a Rule 12(b)(6) motion, as it provides plain notice to Defendants as to the basis for the claims asserted.[12]

---

**10.** For example, at Bey's murder trial, Defendant Bennett allegedly "testified that he continued to question Mr. Bey so that he could obtain a statement to use for impeachment." (Complaint ¶ 23).

**11.** The deception is compounded by the fact that in *Harris*, there was no claim "that the police knowingly engaged in calculated misconduct in order to secure the disputed evidence." *Cooper*, 963 F.2d at 1249. Similarly, in *Tucker*, the *Miranda* violation was the product of "inadvertent disregard" and not intentional conduct. 417 U.S. at 445, 94 S.Ct. at 2364.

**12.** At oral argument, counsel for the Los Angeles defendants argued that Bey's complaint lacked sufficient detail to allege coercion. Pursuant to Fed.R.Evid. 201, the Court takes judicial notice of the fact that the California Court of Appeals has already concluded that all of Bey's statements were coerced and involuntary. *People v. Bey*, 21 Cal.App.4th 1623, 1628, 27 Cal.Rptr.2d

28 (1993). The Court notes that the following exchange, by itself, would be a sufficient allegation:

[Appellant]: Well, if I'm being charged with something, I'd rather not have anything else to say until I have an attorney.

[Detective Bennett]: Okay? Let me explain something for you, James. I'm going to continue to ask you questions. Now, you realize that you didn't waive your rights. That means we can't use 'em in court.

[Detective Crosby]: I think James is familiar with out [unintelligible] outside Miranda. Are you familiar with that, James?

[Appellant]: I don't—I don't know too much about the law. I'm just telling you I know to keep my mouth shut [unintelligible] somebody to put me in jail.

*Id.* at 1627, 27 Cal.Rptr.2d 28. Nevertheless, after this exchange, the detectives continued to question Bey. *Id.*

Finally, in at least one respect, this case is even more egregious than that in *Cooper*. The dissent in *Cooper* focused on the fact that Cooper never stood trial and hence "was not compelled to be a witness against himself." 963 F.2d at 1253 (Brunetti, J., dissenting). In this case, however, both Bey and McNally did stand trial. Therefore, the reason that the dissent would have found no cause of action under § 1983 in *Cooper* is not applicable to this case.

Accordingly, at this stage of the litigation, the Court views the allegations in this case as indistinguishable from the facts in *Cooper*. In both cases, police officers acted pursuant to a deliberate, premeditated policy of ignoring of suspects' assertions of *Miranda* rights. In both cases, police officers deceived the suspects so as to make the interrogations more effective.

This conclusion is bolstered by *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). In *Tucker*, the police officers arrested the defendant prior to the *Miranda* decision, and as a result, failed to inform the suspect that he had the right to have an attorney appointed if he could not afford one. The suspect waived his rights based on this faulty advisement. *Id.* at 436, 445, 94 S.Ct. at 2359–60, 2364. The Supreme Court noted "that the police conduct at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege." *Id.* at 445–46, 94 S.Ct. at 2364–65. The Supreme Court declined to suppress the testimony of a witness identified by the defendant during a custodial interrogation following the faulty *Miranda* advisement. The Supreme Court noted that the rationale behind *Miranda* was "to deter—to compel respect for the constitutional guaranty" and that this deterrent purpose was applicable where there was "willful, or at the very least negligent, conduct which has deprived the defendant of some right." *Id.* at 446, 94 S.Ct. at 2365. Thus, in *Tucker*, the wrongful conduct was merely a negligent and faulty warning.

In this case, on the other hand, the defendants are not alleged to have given faulty warnings. And the alleged conduct cannot be described as a simple "departure" from *Miranda*'s prophylactic standards, since neither Bey nor McNally waived his rights, as Tucker did. Instead, the allegations are that police officers continued to question suspects, knowing that they were ignoring assertions of *Miranda* rights, and relying on the *Harris* impeachment exception.

The impeachment exception was certainly not intended to provide the police with the option of either ceasing questioning or continuing onward in the hopes of acquiring impeachment evidence. *Cooper*, 963 F.2d at 1249 ("This tactic corrupts the doctrine established in *Harris*."). This conclusion is clear when one considers the rationale behind the impeachment exception: "Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." *Harris*, 401 U.S. at 225, 91 S.Ct. at 645. In *Tucker*, the Supreme Court noted:

> By refusing to admit evidence gained as a result of [negligent or willful] conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

417 U.S. at 447, 94 S.Ct. at 2365. It is unfortunate that this case accuses police officers of ignoring the Supreme Court's directive by twisting a rule designed not to punish good faith into another example of calculated evasion of the Constitution. "When law-enforcement officials act this way, they invite redress under § 1983." *Cooper*, 963 F.2d at 1252.

Defendants argue that their questioning was merely benign. While the record may eventually support such a finding, the Court cannot conclude that allegations of conscious decisions to ignore Supreme Court doctrine, coupled with deliberate deception, constitute

benign questioning.[13] Considering the Court's decision that Plaintiffs CACJ and CCBA lack standing to seek injunctive relief, only Bey and McNally can challenge the alleged actions of the police. For the Court to conclude that Bey and McNally fail to state a cause of action on these allegations would be to condone the lawless actions that are charged in this case.

The Court cannot do so.

### B. Qualified Immunity

■ Defendants Cooper, Talbot, Bennett, and Crosby argue that even if Bey and McNally state a cause of action under § 1983, they should be dismissed, as they are protected by qualified immunity.

■ A government official is entitled to qualified immunity only if he is "performing discretionary functions" and if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Furthermore, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3037, 97 L.Ed.2d 523 (1987).

The gravamen of the defendants' argument is that a reasonable police officer would not know that it is a violation of a suspect's *Miranda* rights to continue to question the suspect after he has invoked his right to silence or to counsel.

The Court rejects this argument. The Supreme Court has stated in no uncertain terms that "once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1965). Similarly, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1628.

The Supreme Court has never wavered from this clear rule. *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 2568–69, 61 L.Ed.2d 197 (1979) (describing *Miranda* as a "rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease"); *Michigan v. Mosley*, 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975) (noting that interrogation must cease until an attorney is present when the right to counsel is invoked). In *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), the Supreme Court summarized these cases and then reconfirmed their holdings, emphasizing "that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."

■ *Miranda* is clear and unequivocal: interrogation *must* cease after a suspect's invocation of Fifth and Sixth Amendment rights. No reasonable police officer could read *Miranda* any other way.

Thus, this case is much different from that presented in *Anderson*, where the right alleged to have been violated was "the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances." 483 U.S. at 640, 107 S.Ct. at 3039. The Supreme Court noted that in defining the right in such general terms, the court below did not analyze whether it was clearly established that the particular factual circumstances of that case did or did not support probable cause. *Id.* at 641–42, 107 S.Ct. at 3039–40.

■ As a last attempt at establishing qualified immunity, Defendants argue that,

---

**13.** In light of the California Court of Appeals ruling in *Bey,* the Court finds the city attorney's insistence that the questioning of Bey was "benign" and "noncoercive" to be troubling. Under Fed.R.Civ.P. 11(b), the city attorney has represented to the Court that this claim of benign and noncoercive questioning has "evidentiary support or . . . [is] likely to have evidentiary support after a reasonable opportunity for further investigation and discovery." Nevertheless, the Court need not and therefore does not reach the merits of this issue at this time.

at least until *Cooper* in 1992, no federal court had established civil liability under § 1983 for violations of *Miranda* rights. This argument, however, misses the point of qualified immunity. As stated in *Harlow*, the test for qualified immunity is whether the government official realizes that his actions violate a constitutional or statutory right, not whether his actions subject him to civil liability. In this regard, it is notable that *Harlow* includes "statutory" rights—the official need not violate a constitutional right to lose qualified immunity. This distinction is significant, as the defendants' argument hinges on the fact that a violation of *Miranda* is not a violation of a constitutional right.

Nor is the denial of qualified immunity in this instance contrary to the purpose of the defense. In *Harlow*, the Supreme Court reasoned that qualified immunity was necessary to ensure that when government officials must take action where "clearly established rights are not implicated," they can act "with independence and without fear of consequences." 457 U.S. at 819, 102 S.Ct. at 2739 (quoting in part *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967)). However, the Supreme Court also noted that:

> Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate.

*Id.* Qualified immunity is not intended to be a "license to lawless conduct." *Id.*

The defendants argue that denying them qualified immunity in this situation will chill their future law enforcement activities. Taken at face value, what the defendants suggest is that they will be less aggressive about questioning criminal suspects in the future for fear of civil liability.[14] But this argument is critically flawed, as it presumes that the line between "wrongful" and "acceptable" conduct is blurred and indistinct. As noted above, *Miranda* and its progeny could not be more clear. To avoid liability, police officers need only obey the commands of *Miranda* and cease interrogation once a suspect invokes his right to counsel.

 If the allegations by Bey and McNally prove to be true, the defendant detectives may believe that their police chiefs misled them as to the requirements of *Miranda*. However, these defendants cannot escape liability for their conduct merely by claiming that they were "enforcing policies or orders promulgated by those with superior authority." *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir.1994).[15] The claim of following orders applies only when reliance is objectively reasonable. *Id.* A reasonable person could not reconcile the alleged practice of ignoring the assertion of *Miranda* rights with the commands of *Miranda*, and hence, reliance on the alleged policy cannot be objectively reasonable.

### Conclusion

Accordingly, the Court dismisses Plaintiffs CACJ and CCBA for lack of standing, without leave to amend. However, the Court denies the motion to dismiss the claims by Plaintiffs Bey and McNally, and further holds that qualified immunity is not available to Defendants Cooper, Talbot, Bennett, and Crosby.[16]

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by telefax or by United States mail, copies of this Order on counsel for the parties in this matter.

---

**14.** *Cf. Cooper*, 963 F.2d at 1255 (Brunetti, J., dissenting) ("The majority opinion provides no meaningful guidance and is likely to lead to a quagmire of claims").

**15.** This argument is, of course, the same unsuccessful argument made by Lieutenant Calley, who was convicted of multiple counts of murder in the My Lai massacre despite his claim that he slaughtered Vietnamese civilians under orders from commanding officers. *United States v. Cal-*

ley, 46 C.M.R. 1131, 1182–83 (C.M.A.1973) ("Not every order is exonerating.").

**16.** At oral argument, the Court had suggested that qualified immunity might be more appropriately raised in a separate motion. Such a motion will be unnecessary until the summary judgment stage, when the defendants may be able to demonstrate a different state of facts than those that are alleged in the complaint.