CALIFORNIA ATTORNEYS FOR CRIMINAL JUSTICE; Criminal Courts Bar Association; James McNally; James Johnson Bey, Plaintiffs–Appellees,

v.

James T. BUTTS, City of Santa Monica Chief of Police; The City of Santa Monica; Ray H. Cooper; Shane Talbot, Defendants–Appellants,

and

Willie L. Williams, Chief of Police; City of Los Angeles; Raymond Bennett; Michael Crosby, Defendants.

California Attorneys for Criminal Justice, Plaintiff,

James McNally; James Johnson Bey, Plaintiffs–Appellees,

v.

James T. Butts, City of Santa Monica Chief of Police; The City of Santa Monica; Ray H. Cooper; Shane Talbot; City of Los Angeles, Defendants–Appellees,

v.

Raymond Bennett; Michael Crosby, Defendants–Appellants.

Nos. 97–56499, 97–56510.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1998.

Filed Nov. 8, 1999

As Amended on Denial of Rehearing and Rehearing En Banc Jan 8, 2000.*

---

* Judge Thomas has voted to deny the petition for rehearing en banc, and Judge Canby so recommended. Judge Schwarzer has voted to grant the petition for panel rehearing and recommends granting the petition for rehearing en banc.

Marsha Jones Moutrie, City Attorney, Barbara Greenstein, Deputy City Attorney, Santa Monica, California; Debra L. Gonzales, Deputy City Attorney, Los Angeles, California, for the defendants-appellants.

Charles D. Weisselberg, Victoria Wong (Law Student), Center for Clinical Edu-

cation, University of California, Boalt Hall, Berkeley, California; Mark Rosenbaum, Taylor Flynn, Sophie-Anne Fanelli (Law Student), ACLU Foundation of Southern California, Los Angeles, California; Michael J. Brennan, Carrie L. Hempel, Denise Meyer, Jack R. Scharringhausen (Law Student), Post-Conviction Justice Project, University of Southern California Law School, Los Angeles, California, for the plaintiffs-appellees.

Joel E. Carey, Deputy Attorney General, Sacramento, California, for amicus State of California; Charles L. Hobson, Criminal Justice Legal Foundation, Sacramento, for amicus Criminal Justice Legal Foundation; Devallis Rutledge, Office of the District Attorney, Santa Ana, California, for amicus California Coalition of Law Enforcement Associations; William J. Hadden, Silver, Hadden & Silver, Santa Monica, California, for amici Peace Officers' Legal Research Association Legal Defense Fund, Santa Monica Police Officers' Association, Los Angeles Police Protective League; Dilan A. Esper, West Hollywood, California, National Association; Mark A. Borenstein, Tuttle & Taylor, Los Angeles, California, for amicus National Association of Criminal Defense Lawyers.

Before: CANBY, Jr. and THOMAS, Circuit Judges, and SCHWARZER,[1] District Judge.

CANBY, Circuit Judge:

James McNally and James Bey, California state prisoners, joined in bringing this

civil rights action against the cities of Los Angeles and Santa Monica, California, individual police officers and their respective Chiefs of Police. *See* 42 U.S.C. § 1983. McNally and Bey complain that they were the victims of a policy of the defendant police to defy the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The alleged policy, set forth in certain training programs and materials, was to continue to interrogate suspects "outside *Miranda*" despite the suspects' invocation of their right to remain silent and their requests for an attorney.

The district court denied the motions of individual defendants James Butts, Jr., Shane Talbot, Ray Cooper, Raymond Bennett and Michael Crosby, for summary judgment on the ground of qualified immunity.[2] Those officers have now brought this interlocutory appeal challenging the denial of immunity. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). We affirm the order of the district court denying qualified immunity.[3]

## BACKGROUND

*Miranda* requires that, once "the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. 1602. These commands are clear on their face. Statements of an accused taken in violation of *Miranda,* however, have been held admis-

---

1. The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

2. We reject the plaintiffs' contention that defendant James Butts, the Santa Monica Chief of Police, did not seek qualified immunity in the district court and is thus not entitled to this appeal. The record indicates that Butts did request qualified immunity.

3. The order of the district court denying summary judgment is unpublished. The district court earlier entered an order denying a motion to dismiss on the ground of qualified immunity. That order is published. *See California Attorneys for Criminal Justice v. Butts,* 922 F.Supp. 327 (C.D.Cal.1996).

sible for purposes of impeachment of a defendant who takes the stand and testifies inconsistently with his prior statement. *See Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The policy of questioning "outside *Miranda*" appears to be based on the proposition, which we reject, that *Harris* and *Hass* negate the quoted imperatives of *Miranda*.[4] How the policy of questioning "outside *Miranda*" worked in practice in these two cases is best demonstrated by the transcripts of the taped interview sessions with McNally and Bey.

*James McNally Interrogation*

Santa Monica detectives interrogated McNally about his role in a brutal murder. The interview took place in a jail in Arizona and lasted for over an hour. McNally was advised of his *Miranda* rights and freely answered questions for a considerable period of time. He did not deny having stabbed the victim, but claimed that he had acted in self-defense. Eventually, the discussion focused on the degree of crime that might be charged, and whether McNally would waive extradition. At this point, the questioning took the following turn:

> McNally: How 'bout we do this? How 'bout I'll waive extradition. I'll go with "you's." Let me talk to a California lawyer and we'll get back together.
> D1:[5] You'll what?
> McNally: Okay. I'm saying, "I'll waive extradition. I'll go with 'you's' " no hassle, no problem....
> D: Okay. Under, understand....
> McNally: So ...
> D: ... understand what happens when you get to California—when you get your attorney. No attorney in his right mind is gonna' tell you talk with the police.

4. The defendants do not urge that their questioning of McNally and Bey after they requested an attorney was justified by exigent circumstances. There was, for example, no ticking bomb that had to be located. *Cf. New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626,

> McNally: Oh, I know ...
> D: Justice works the same way as it does on the East Coast.
> McNally: No, I, I understand. I, I just wanna' clarify a couple things in my mind. I, I know that. I know a lawyer's not gonna' tell me to talk to "you's."
> D: Right.
> McNally: I know that. Let me just talk to him about a couple—you know, I know Pennsylvania Law just 'cuz I've been through it. I don't know California Law. I don't ... let me talk to him a little bit and we'll get back—I promise I'll get back together with "you's."
> D: So, you don't wanna'....
> D1: You're not gonna tell us ...
> D: ... you don't wanna' tell us what happened ...
> McNally: No ...
> D: ... now?
> McNally: ... not at this time. It's, it's too scary for me right now. I'd, I'd rather talk to a lawyer.
> D: Alright.
> McNally: I'm not trying to impede your investigation.
> D: No, I understand.
> McNally: I'll with "you's" ... [sic]
> D: I understand.
> McNally: ... no hassle....
> D: Okay, now, let me, let me explain to you what's happened. You've basically invoked your Right to have an attorney ...
> McNally: Right.
> D: ... okay? At this point, nothing that you say can be used against you in Court ... in California because you have invoked your Right to have an attorney.

81 L.Ed.2d 550 (1984) (recognizing public safety exception to *Miranda*).

5. In the transcript, "D" is Detective Talbot; "D1" is Detective Cooper. McNally is abbreviated "M" in the transcript but is spelled out here to aid understanding.

McNally: Right.

D: I still would like to know what happened now because—well, I'll tell you where I come from. I don't trust anything that anybody tells me after they've talked to an attorney and the D.A. that will be working with us on this case doesn't either.

So, basically, what they'll do is they'll play a game of "what's this case worth?" And they'll do "make, let's make a deal type thing."

McNally: I know.

D: What I wanna' know from you now is what you might tell me later so I know what you tell me later is the same as what you're gonna' tell me now because what you tell me later is gonna' be on the record.

D1: This is all on tape. This—what we're tellin' you. You've invoked your Rights. Everything from this point on . . .

D: Cannot . . .

D1: . . . regarding this case cannot be used against you. We're, we're making you the guarantee. It won't . . . you know, even though its on tape. . . .

McNally: Shut that thing off then.

D: Well, this is the record of what you're telling us. You, we . . .

D1: Yeah. It's also the record of you invoking your Rights. You want an attorney . . . . which is fine . . .

D: And it's—let me explain to you something else. Basically, what this does is validate for you and for the District Attorney that what you tell me now is what you're gonna' tell—hopefully, tell us later. 'Cuz the evidence will bear out, I think, what I, I already know.

So, once we start a tape, we don't turn it off. If you wanna' turn off the tape then we stop the conversation and, and we'll go ahead. . . .

D1: See . . .

D: . . . and do the process. I just wanted to explain to you and I'm not trying to be "hard ass" about this. It's just the way I work. I know it's the way the District Attorney that I'm working with, uh, Richard Stone, works. We just—and if you were in our place, would you trust something that somebody told you after they talked to an attorney?

D1: It's like "black mail" with attorneys, Man. We know that.

D: I mean, I mean, first of all, if you could trust the attorney that you're working with he's gonna', and if you can work and if you tell him the truth, he gonna' work with you somehow to make a better deal, okay?

McNally: (no audible response).

D: They're, the deal is here. It's up to them . . .

D1: It's . . .

D: . . . it's up to them to talk about it. The only thing is, everything that falls after this—we'll go in one direction based on the physical evidence and the statements that we have. If we don't have anything to the contrary, that's the direction we're gonna' go and we're gonna' push it.

McNally: Right.

D: Okay, and fuck your attorney. It's just—I don't care about him anymore.

McNally: Yeah.

D: Okay. As far as I'm concerned, you know, they really mess up the system. I wanna' know now what you're going to tell me later. It can't be used against you. We . . .

D1: This is your opportunity.

D: . . . told you that.

D1: And it's—this is your opportunity and it's not gonna' be used against you. If you . . .

D: If you want, you can write it out and start it with "The Detective told me this statement cannot be used against me . . ." I'll sign it and I'll make a xerox copy of it and you can have a xerox. It's up to you. I'm not tryin' to trick you here.

(pause)

McNally: Alright. I'll . . . and this can't be used against me.

D1: No, absolutely. It's right on there. It's not—we're promising you, it's not gonna' be used against you—in the case in chief—against you, okay? Just, this is for our edification of what happened.

McNally then proceeded to tell the detectives a very different, and far more incriminating story.

At his trial, McNally moved to suppress his incriminating statement, and the trial court granted the motion, prohibiting the use of the statement even for purposes of impeachment. After McNally was convicted, however, the prosecutor used the statement against McNally at sentencing to urge the court to consider as an aggravating factor McNally's assertions of self-defense in contradiction of his statement to the police.

### James Bey Interrogation

Bey was also suspected of a brutal murder. Los Angeles police interrogated him after he had been handcuffed to a bench at the police station for four hours. He was asked a few questions about the matter before he was given his *Miranda* warnings. Immediately thereafter, the following exchange occurred:

Bey: Am I being charged with murder? If I'm being charged with murder, then I won't have another word to say until I have an attorney.

D[6]: Is that—ah—your feelings? Do you—That's why I questioned you, do you wish to-

Bey: * * * if you read me those rights, you must be gonna charge me with something. So I'll wait and see what happens. I won't say another word until I have an attorney.

D: Well, like you say yourself, James, you're a suspect.

Bey: Well, if I'm being charged with something, I'd rather not have anything else to say until I have an attorney.

D: Okay?

Let me explain something to you, James. I'm going to continue to ask you questions. Now, you realize that you didn't waive your rights. That means we can't use 'em in court.

U: I think James is familiar with out * * * outside Miranda. Are you familiar with that, James?

Bey: I don't—I don't know too much about the law. I'm just telling you I know to keep my mouth shut * * * somebody to put me in jail.

D: Well, James, I'll tell you what, there's a lot of physical evidence which doesn't lie, James.

Do you know why we were so long before we got here to talk to you?

Bey: No, I don't. I know that you all were in my apartment looking around. I don't know what you were looking for.

D: Not only looking around. We were in your apartment with our what they call Scientific Investigation Division people, or personnel. These are experts in getting physical evidence.

Bey: Uh-huh.

D: And we got some very incriminating physical evidence, my friend.

Bey: * * *

D: Stuff that can't be explained away.

Bey: Well, we'll have to see what happens. But I'm not gonna say nothing * * * an attorney * * *.

D: Why don't you tell me what happened that night?

Thereafter, Bey admitted that the murder victim had been in his apartment on the night she was killed, and that she had previously "ripped him off" of small amounts of money. He also made various other statements about the evening in question, although he denied committing the murder. Bey stated in his deposition that Detective Bennett appeared angry at times during the interview, spoke loudly, made threatening gestures, and adopted a "condemnatory" tone.

---

**6.** In the Transcript, "D" is Detective Bennett; "U" is an "unidentified detective," alleged elsewhere to be Detective Crosby. In the Transcript, Bey is denoted as "B" but his name is spelled out here for ease of understanding. Unintelligible passages in the tape of interview are denoted in the Transcript by asterisks: " * * *."

At trial, Bey testified and his statement was used to impeach him. He was convicted of first degree murder. On appeal, the state court of appeal, after reviewing the uncontradicted evidence, stated: "We ... are compelled to conclude that under these circumstances, appellant's statements were coerced and involuntary, and should not have been introduced to impeach his trial testimony." *People v. Bey*, 21 Cal.App.4th 1623, 27 Cal.Rptr.2d 28, 31 (1993). The court held the error to be harmless, however, and affirmed the conviction. *Id.* at 32.

## DISCUSSION

There can be little question that the insistence of the above interrogators on questioning after invocation of the right to silence and unequivocal requests for counsel violated the strictures of *Miranda* and did so intentionally. The defendants contend, however, that they are nevertheless entitled to qualified immunity because reasonable officers in their position could have believed that their interrogation did not violate "clearly established rights" of McNally and Bey. *See Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Their contention is based on three propositions, all of which we reject: (1) that McNally and Bey have not alleged violation of a constitutional right; (2) that the right was not clearly established, in light of subsequent qualifications of *Miranda*; and (3) that the defendants could reasonably rely on training materials endorsing questioning "outside *Miranda*." We address these contentions in turn.

### The Constitutional Right

The first question is whether McNally and Bey have alleged the violation of a constitutional right at all. *See County of Sacramento v. Lewis*, 523 U.S.

833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998). The defendants contend that *Miranda* is a prophylactic rule, not a constitutional right. In the narrowest sense, this contention is correct: there is no constitutional right to the *Miranda* warnings themselves. *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). But *Miranda* rights are brigaded with the right against self-incrimination and supply "'practical reinforcement' for the Fifth Amendment right." *Id.* (quoting *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). Indeed, the connection between *Miranda* and the constitutional right against self-incrimination is demonstrated by the fact that *Miranda* reversed a state court judgment, even though the Supreme Court observed that it "might not find the defendants' statements to have been involuntary in traditional terms." *Miranda*, 384 U.S. at 457, 86 S.Ct. 1602. The Supreme Court has continued to enforce *Miranda* in both direct and habeas corpus review of state court judgments. *See, e.g., Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (direct review); *Withrow v. Williams*, 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (habeas corpus). The Supreme Court's review of state judgments is confined, of course, to constitutional issues; it has no power to enforce mere supervisory rules on the States. *Mu'Min v. Virginia*, 500 U.S. 415, 422, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). Thus *Miranda* cannot be viewed entirely apart from the constitutional rights that it protects.

The defendants argue, however, that all of these cases deal with the *admission* of statements taken in violation of *Miranda*; they do not deal with a right against questioning apart from use of the statements at trial.[7] It is very difficult, however, to read *Miranda* that way:

7. There is a certain perversity in this argument. The exclusionary rule is strong and unpleasant medicine that can keep probative evidence from the jury. The primary reason for employing the rule, with all its disadvantages, is that it is normally the most effective

way to achieve the overarching goal of controlling police behavior that threatens the constitutional rights of individuals. *See, e.g., Elkins v. United States*, 364 U.S. 206, 217–18, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). It

**1046**

Today, then, there can be no doubt that the Fifth Amendment privilege is available *outside of criminal court proceedings and serves to protect persons in all settings* in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and *the exercise of those rights must be fully honored.*

*Miranda,* 384 U.S. at 467, 86 S.Ct. 1602 (emphases added). This language focuses on rights of individuals *at interrogation.*

In any event, we have squarely rejected the defendants' contention in *Cooper v. Dupnik,* 963 F.2d 1220, 1251 (9th Cir.1992) (en banc). "It is wrong ... to relegate [the warning of the right to remain silent] to the status of 'only a prophylactic device': It is a prophylactic device, but it expresses a substantive right." *Id.* at 1240. In *Cooper,* we rejected a claim of qualified immunity asserted on behalf of officers who had interrogated a suspect who was never tried. We held that the request for an attorney is an "invocation of the substantive right to remain silent." *Id.* We held that the decision to interrogate Cooper despite his requests for an attorney, and to persist until Cooper broke down (even though he never confessed), was coercive and violated Cooper's constitutional rights.

"It is irrelevant that Cooper's coerced statements were never introduced against him at trial. The Task Force's wrongdoing was complete at the moment it forced Cooper to speak." *Id.* at 1237.[8]

The defendants seek to distinguish *Cooper* on the ground that the nature of the questioning there was far more intimidating and coercive than that directed at McNally and Bey. They rely on *Cooper*'s point that a bare violation of *Miranda* is not enough to sustain a claim under § 1983:

This case does not establish a cause of action where police officers continue to talk to a suspect after he asserts his rights and where they do so in a *benign way, without coercion or tactics that compel him to speak.* What we do confront is a case laden with police misconduct that is "identical with the historical practices [of incommunicado interrogation] at which the right against self-incrimination was aimed."

*Cooper,* 963 F.2d at 1244 (emphasis added) (quoting *Tucker,* 417 U.S. at 444, 94 S.Ct. 2357). But coercion has been claimed and the question whether it occurred remains to be tried; the district court held that McNally and Bey had raised a material issue of fact on that point, and denied summary judgment.[9] The district court's ruling is not surprising, in light of the fact that the state trial court suppressed McNally's statement even for impeachment purposes, and the state appellate court expressly concluded that Bey's statement was coerced. The district court was well aware of the distinction reflected in the above quotation from *Cooper,* but it also recognized that a failure to comply with *Miranda* can be viewed as an aggra-

makes no sense to hold that other means of controlling police behavior ought not to be permitted because the exclusionary rule, though ineffective for the purpose, is in place.

8. Thus McNally's and Bey's claims are not defeated by the fact that their statements may not have caused them harm at their trials; they seek redress for violations of their rights

in the jail or stationhouse, not in the courthouse.

9. McNally and Bey moved for summary judgment on their claim; the district court denied the motion. That denial of summary judgment, of course, is not subject to interlocutory appeal and is not before us. *See* 28 U.S.C. § 1291.

vation of other coercive tactics. *California Attys. for Criminal Justice v. Butts*, 922 F.Supp. 327, 336 & n. 13 (C.D.Cal.1996); *see Collazo v. Estelle*, 940 F.2d 411, 418 (9th Cir.1991). Indeed, in recently holding a confession to have been coerced, we placed great emphasis on the fact that officers had ignored a request for counsel and had misrepresented that any statement thereafter made could not be used in court. *See Henry v. Kernan*, 197 F.3d 1021, 1027 (9th Cir.1999) (amended opinion). In any event, the nature and effect of the defendants' tactics in this case are yet to be resolved by the trier of fact. To the extent that the defendants' claim of immunity depends upon unresolved and genuine issues of fact, it is not appropriate for review on this interlocutory appeal. *See Johnson v. Jones*, 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *Behrens v. Pelletier*, 516 U.S. 299, 312–13, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

## The Right is Clearly Established

 To be "clearly established" for the purpose of overcoming qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. *Miranda* could scarcely be more clear in stating that, once a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, *the interrogation must cease*," and that if he "states that he wants an attorney, the interrogation *must cease until an attorney is pres-*

ent." *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602 (emphases added). *See also Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *Minnick*, 498 U.S. at 152, 111 S.Ct. 486. The rule under these decisions is unmistakable. As we held in *Cooper*, "[t]here is no question that the Constitutional holding in *Miranda* is 'clearly established' law." *Cooper*, 963 F.2d at 1237.[10]

 There is equally no question that reasonable officers in the defendants' position would know that their actions violated McNally's and Bey's *Miranda* rights. McNally and Bey both invoked their rights to speak to an attorney, in a manner indicating that they did not want the interrogation to proceed without such a consultation. The detectives deliberately ignored these requests. Yet, "[t]he *per se* aspect of *Miranda* was ... based on the unique role the lawyer plays in the adversary system of criminal justice in this country." *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). The detectives in McNally's case nevertheless attempted to discourage him from seeking counsel, implied that his situation would become much worse if he spoke with an attorney, and assured him that whatever he said could not be used against him in any way. After telling McNally several times that anything he said thereafter could not be used against him, one of the detectives inserted "in the case in chief," with no explanation of what that term meant. This unexplained qualification,

---

**10.** Defendants also point out that *Cooper* was the first case that allowed recovery under § 1983 for interrogation "outside" Miranda. Accordingly, because *Cooper* was decided after these interrogations, the detectives argue that they were not on notice that their conduct was unconstitutional. This argument misunderstands both *Cooper* and the qualified immunity analysis. First, in *Cooper* we did not *establish* that this conduct is unconstitutional—we *recognized* it. We held that Cooper's rights were clearly established *at the time of his interrogation in 1986*—years before

the interrogation of McNally and Bey. *Cooper*, 963 F.2d at 1237 ("Appellants knew [in 1986] that they were violating the Constitution.") Second, even without an analogous case, the Supreme Court "and our case law do not require that degree of specificity." *Hyland v. Wonder*, 117 F.3d 405, 412 (9th Cir.1997), *cert. denied*, 522 U.S. 1148, 118 S.Ct. 1166, 140 L.Ed.2d 177 (1998). It is not necessary that a case has previously declared the very conduct in question unlawful. We only require that the "unlawfulness must be apparent." *Id.; see also Anderson*, 483 U.S. at 640, 107 S.Ct. 3034.

which McNally has asserted he did not understand, cannot overcome the many untrue and unqualified statements that preceded it.[11]

In Bey's case, the interrogator told Bey that he was going to continue to ask him questions after he asserted his right to remain silent. He went on to advise Bey that because he didn't waive his rights, "[t]hat means we can't use [any subsequent statements] in court." *Bey*, 27 Cal. Rptr.2d at 30. On appeal, the state court found this to be a "very troubling case, presenting a deliberate police violation of *Miranda* coupled with a misrepresentation to appellant about the legal consequences of that violation." *Id.* In so continuing interrogation and misinforming McNally and Bey concerning the legal effects of that interrogation, the defendants clearly violated the *Miranda* imperatives, thereby creating a danger of coercion as well as a presumption of it. *See Oregon v. Elstad,* 470 U.S. 298, 307 n. 1, 105 S.Ct. 1285, 84 L.Ed.2d 222 (*Miranda* violation creates legal presumption of coercion). Nearly identical conduct was one of the major factors leading us to find a confession involuntary in *Henry*, 177 F.3d at 1157.

The defendants contend they could not have known that their conduct violated clearly established rights because of the Supreme Court's rulings that statements taken in violation of the *Miranda* safeguards may be used for purposes of impeachment. *See e.g., Oregon v. Hass,* 420 U.S. 714, 723–24, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). They also rely on *Tucker,* in which the Court permitted the testimony of a witness who had been identified by the defendant in an interview preceded by incomplete advice of his rights. *See Tucker,* 417 U.S. at 438, 94 S.Ct. 2357; *but see Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ("involuntary"

statements not allowed for any purpose). Thus, the defendants argue that they could reasonably believe that it was lawful to continue to press their interrogation, with misleading assurances that any further statements made by McNally or Bey could not be used against them.

*Harris* and *Tucker* are easily distinguished from the present case; both involved interrogations that preceded the decision in *Miranda.* In *Tucker,* the Supreme Court relied on that point, as well as on the fact that the police had acted "in complete good faith." *Tucker,* 417 U.S. at 447, 94 S.Ct. 2357. The interrogation in *Hass* did succeed *Miranda,* however; the defendant was being driven to the police station, was given *Miranda* warnings, and said he wanted to call a lawyer. He was told he could do so when they arrived, but there was further conversation about the crime during the rest of the trip. *Hass,* 420 U.S. at 715–17, 95 S.Ct. 1215. The defendant's statements were held to be admissible for impeachment. *Id.* at 723–24, 95 S.Ct. 1215. *Hass* did not appear, however, to involve a conscious decision to continue interrogation in the hope of obtaining impeachment evidence. That officers might so behave was described as a "speculative possibility," but in any event the Court determined to follow *Harris* and permit use of the statement for impeachment. *Id.* at 723, 95 S.Ct. 1215.

The Supreme Court has never suggested, however, that these decisions dealing with the peripheral use of statements obtained in violation of *Miranda* somehow overcame *Miranda*'s imperatives concerning proper police procedure. Indeed, the Court has on several occasions, after *Harris, Tucker,* and *Hass,* restated those imperatives. In *Fare v. Michael C.,* for example, the Court said:

> their statements can be used against them, *see Miranda,* 384 U.S. at 469, 86 S.Ct. 1602; it can hardly countenance false advice that the statement *cannot* be used against them.

---

11. We recognize that subterfuge may be used in interrogating suspects, but misstating the legal use that can be made of their statements is not a permissible form of subterfuge. *Miranda* requires that suspects be advised that

Whatever the defects, if any, of this relatively rigid requirement that interrogation cease upon the accused's request for an attorney, *Miranda*'s holding has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible.

*Fare*, 442 U.S. at 718, 99 S.Ct. 2560. The Supreme Court later canvassed the *Miranda* progeny in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), stating:

We reconfirm these views and, to lend them substance, emphasize that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.

*Id.* at 485, 101 S.Ct. 1880. Again, in *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), the Court observed that "[t]he *Edwards* rule thus serves the purpose of providing 'clear and unequivocal' guidelines to the law enforcement profession." *Id.* at 682, 108 S.Ct. 2093. *See also Davis*, 512 U.S. at 458, 114 S.Ct. 2350; *McNeil*, 501 U.S. at 177, 111 S.Ct. 2204; *Minnick*, 498 U.S. at 151, 111 S.Ct. 486.

These cases indicate that there has been no weakening in *Miranda*'s mandates to protect the *rights* of suspects *during* custodial interrogation. *See, e.g., Michigan v. Mosley*, 423 U.S. 96, 99, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (*Miranda* promulgated "safeguards to protect the ... constitutional rights of persons subjected to custodial police interrogation."). In the face of these clear and unequivocal directions, reasonable officers in the position of defendants would have understood that they were violating the rights of McNally and Bey in interrogating them in the manner that they did. "Any minimally trained police officer should have known such pressure was improper and likely to produce involuntary statements." *Henry*, 177 F.3d at 1158.

### Reliance on Training and Training Materials

■ The defendants next contend that their reliance on training and training materials entitles them to qualified immunity. The district court rejected this argument holding that "following orders" will only insulate officers from liability when "reliance is objectively reasonable." *Butts*, 922 F.Supp. at 338. The court concluded that a "reasonable person could not reconcile the alleged practice of ignoring the assertion of *Miranda* rights with the commands of *Miranda*, and hence, reliance on the alleged policy cannot be objectively reasonable." *Id.; see also Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994) ("[I]ndividuals cannot always be held immune for the results of their official conduct simply because they were enforcing policies or orders ....").

The fact that Los Angeles and Santa Monica may have trained their police to violate the rights of individuals does not provide any defense for these officers. Their policy contradicts the safeguards provided by *Miranda*, and, at the very least, is in direct conflict with *Cooper*. Contrary to the assertions by the defendants, *Cooper* did not sanction this technique:

The primary aggravating circumstance *is the Task Force's purpose* of making it difficult, if not impossible, for a charged suspect to take the stand in his own defense—as Taylor said, "to help keep him off the stand." By forcing Cooper to talk in the police station, the officers hoped to prevent him from being able to do so in the courtroom. We note that their purpose was not just to be able to impeach him if he took the stand and lied, but to keep him off the stand altogether. *This tactic corrupts the doctrine* [the impeachment exception] established in *Harris*.

*Cooper*, 963 F.2d at 1249 (emphases added) (analyzing whether the police conduct

"shocks the conscience"). Furthermore, training officers that inadmissible statements may nevertheless be used for impeachment purposes hardly sanctions this tactic of routinely and intentionally ignoring requests to speak to an attorney. For all of the reasons set forth in the preceding section of this opinion, a reasonable police officer should have known that this conduct was improper and violated the rights of McNally and Bey, whether or not the conduct was endorsed by training materials. Moreover, these officers had discretion over their interrogation methods. Their training did not require officers to interrogate "outside *Miranda.*" They acted at their own election.

## CONCLUSION

The issue in this case is limited to whether these officers are entitled to qualified immunity as a matter of law. Accepting the facts as presented by McNally and Bey, as we must on summary judgment, *see Behrens,* 516 U.S. at 312–13, 116 S.Ct. 834, we conclude that the district court correctly ruled that the defendants were not entitled to qualified immunity. Officers who intentionally violate the rights protected by *Miranda* must expect to have to defend themselves in civil actions.

The order of the district court denying summary judgment on the ground of qualified immunity is

**AFFIRMED.**

SCHWARZER, Senior District Judge, Dissenting and Concurring:

I respectfully dissent as to plaintiff James Bey and concur in the judgment as to plaintiff James McNally. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), tells us that the discretionary acts of government officials are protected by qualified immunity unless

> the right the official is alleged to have violated ... [has] been "clearly established." The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [That] is

to say that in the light of pre-existing law the unlawfulness must be apparent. *Id.* at 640, 107 S.Ct. 3034. In determining the validity of the qualified immunity claim, therefore, we must look at the state of the law at the time the conduct complained of occurred. *See Doe v. Petaluma City Sch. Dist.,* 54 F.3d 1447, 1451 (9th Cir.1995) (qualified immunity upheld because right of action under Title IX not clearly established until Supreme Court so decided, subsequent to the complained of conduct).

## I. BEY

The majority rests its decision on the proposition that "[o]fficers who intentionally violate the rights protected by Miranda [[by] insistence ... on questioning after invocation of the right to silence and unequivocal requests for counsel] must expect to have to defend themselves in civil actions." Op. at 1050. Plaintiff James Bey was interrogated on March 8, 1991, by Officers Raymond Bennett and Michael Crosby. On February 6, 1991, one month earlier, a panel of this court decided *Cooper v. Dupnik,* 924 F.2d 1520 (9th Cir.1991) (*Cooper I* ), rev'd en banc, 963 F.2d 1220 (9th Cir.1992) (*Cooper II* ). Cooper had brought a § 1983 action against police officers and others alleging various violations of his constitutional rights in connection with his interrogation while in custody. The opinion states that "Cooper contends that his continued interrogation, following his clear and unequivocal request to contact his attorney is a patent violation of the constitution." *Id.* at 1526. It then goes on to firmly reject this contention, reversing the denial of qualified immunity, stating:

> Although there is no case on point from our circuit, all out-of-circuit cases hold that a plaintiff may not, as matter of law, maintain a section 1983 action based upon the failure by the police to issue Miranda warnings. [Citations omitted.] ... These cases are not precisely on point, since in the instant case the police gave the Miranda warnings but refused

to allow Cooper to exercise his rights. But the reasoning of these cases does apply-since Miranda requirements are not a constitutional prerequisite, their violation cannot form the basis of a section 1983 suit.... Cooper can cite to no case allowing a section 1983 suit under the circumstances of his case.

*Id.* at 1527–28.[1]

Moreover, the Supreme Court had repeatedly held prior to March 1991 that Miranda's warning requirement is not a dictate of the Fifth Amendment. Thus, in *Connecticut v. Barrett,* 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Court said:

It remains clear, however, that this prohibition on further questioning-like other aspects of Miranda-is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose. [Citation omitted.] By prohibiting further interrogation after the invocation of these rights, we erect an auxiliary barrier against police coercion.

*Id.* at 528, 107 S.Ct. 828. *See also Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (finding "these procedural safeguards were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected"); *New York v. Quarles,* 467 U.S. 649, 653 & n. 3, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (because Miranda is only a "prophylactic" rule, the Court considered a threat to public safety and acknowledged some "limited circumstances where the judicially imposed strictures of Miranda are inapplicable"); *Duckworth v. Eagan,* 492 U.S. 195, 201–03, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (telling a suspect that an attorney will only be appointed if and when the suspect goes to trial does not render the notice constitutionally inadequate because the warnings mandated by Miranda are "procedural safeguards" and "prophylactic," not requiring administration in any exact form); *Michigan v. Harvey,* 494 U.S. 344, 350–51, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (admitting a statement made without counsel and "not subject to proper Miranda" for impeachment purposes because the violations alleged "relate only to procedural safeguards"). Similarly, the Ninth Circuit prior to March 1991 did not recognize Miranda warnings as a cognizable constitutional right. "Miranda violations do not abridge the Fifth Amendment constitutional privilege against self-incrimination, but instead involve prophylactic standards laid down to safeguard that privilege." *United States v. Patterson,* 812 F.2d 1188, 1193 (9th Cir.1987).

In declaring that "continued interrogation after a defendant invokes his Miranda right to counsel does not violate the Fifth Amendment," *Cooper,* 924 F.2d at 1528, and "that a violation of Miranda rights is not itself a violation of the constitution," *Id.* at 1527, the opinion in *Cooper I* was consistent with prior Supreme Court and Ninth Circuit law as it stood in 1991. Thus, the rationale of the majority opinion-that the officers violated a clearly established constitutional right by questioning Bey after he invoked his right to silence-cannot stand.[2] Bey argues, however, that this case is not about violation of the Miranda rules, but about coercion in violation of the Fifth Amendment. The question remains whether in 1991 there was clearly established law that the officers' interroga-

---

1. The dissenting opinion did not take issue with this reasoning but read the allegations of the complaint as stating a claim for violation of rights secured by the Fifth, Sixth and Fourteenth Amendments. *Id.* at 1538.

2. It is true that in *Cooper II,* the court found that the officers knew in 1986 that they were violating the Constitution. 963 F.2d at 1237.

Apart from the fact that the conduct involving Bey was substantially different from that involved in *Cooper,* the officers in *Cooper* did not have before them a court of appeals opinion rendered the preceding month that told them that violation of the Miranda rules was not a constitutional violation that could support a § 1983 claim.

tion violated the Fifth Amendment, i.e., when they continued the interrogation despite the suspect's repeated attempts to invoke his Miranda rights, asserted that they could not use his statements in court, and claimed that they possessed incriminating physical evidence. Op. at 1045–46. It is not enough for the court simply to say that such interrogation tactics may be found to be coercive; for qualified immunity to be overcome, the law to that effect must be clearly established. The majority's reliance on the Miranda rules on this issue is a bootstrap argument for, as noted, those rules do not establish a constitutional right. The Court's statement in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 is apposite: "[I]f the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow* [*v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ]." *Id.* at 639, 107 S.Ct. 3034. *Anderson* requires that "in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 640, 107 S.Ct. 3034. Because there was no such law in 1991, defendants' qualified immunity motion as to Bey's claims should have been granted.

## II. McNALLY

Plaintiff James McNally was interrogated by Officers Ray Cooper and Shane Talbot on March 2, 1993. *Cooper II* had been decided on May 5, 1992, ten months earlier. In *Cooper II*, an *en banc* panel of this court reversed *Cooper I* and found interrogation "that was involuntary *be-cause it was actively compelled and coerced* by law-enforcement officers during in-custody questioning" can form the basis for a § 1983 action against the police officers who interrogated him. *Cooper*, 963 F.2d at 1243. The limits of *Cooper II*'s holding, as relevant to this case, are encapsulated in the following statement: "This case does not establish a cause of action where police officers continue to talk to a suspect after he asserts his rights and where they do so in a benign way, without coercion or tactics that compel him to speak." *Id.* at 1244. It is plain, therefore, that *Cooper II* does not establish law that supports the majority opinion's broad rationale that "the insistence of the ... interrogators on questioning after invocation of the right to silence and unequivocal requests for counsel violated the strictures of Miranda" and thereby barred qualified immunity. Op. at 13399. Before a constitutional violation can be found, there must be more than a Miranda infraction-there must be coercive tactics that compel the suspect to speak in violation of the Fifth Amendment. *Id.* at 1243–1244.

The question is what tactics, in 1993, were clearly established by law to be coercion violating the Fifth Amendment. The majority summarizes the conduct of the officers as "attempt[ing] to discourage [McNally] from seeking counsel, impl[ying] that his situation would become much worse if he spoke with an attorney, and assur[ing] him that whatever he said could not be used against him in any way." Op. at 1045.[3] In July 1991, this court held substantially similar questioning of a sus-

---

3. Note that Bey's case is different, both on its facts and on its timing. The officers interrogating Bey in 1991 did not denigrate the role of counsel or threaten Bey with harsher treatment as a result of his invocation of his right to remain silent. In contrast, in McNally's interrogation, the detectives repeatedly indicated they would not trust McNally if he chose to consult a lawyer:
 Detective: —[Y]ou have invoked your right to have an attorney.
 McNally: —Right.
 Detective: —I still would like to know what happened now because-well, I'll tell you where I come from. I don't trust anything that anybody tells me after they've talked to an attorney and the D.A. that will be working with us on this case doesn't either. The detectives went on to demean the role of counsel at least four more times, saying attorneys "really mess up the system," "fuck your attorney," "It's like black mail with attorneys, man," and "would you trust something that somebody told you after they talked to an attorney?" McNally proceeded to confess to the murder.

 

pect to be coercion violating the Fifth Amendment. *Collazo v. Estelle*, 940 F.2d 411 (9th Cir.1991) (*en banc*). The critical colloquy between Detective Destro and defendant Collazo, after Collazo asked if he could speak with a lawyer, went as follows:

> Destro:—Once you get a lawyer, he's gonna say forget it. You know, don't talk to the police. Then it might be worse for you.
>
> Collazo:—Pardon me?
>
> Destro:—Then it might be worse for you.

*Id.* at 414.[4] The court held that "demean[ing] the pretrial role of counsel," *id.* at 418, in an "attempt to discourage Collazo from speaking to a lawyer," *id.* at 416, "l[eading] Collazo to believe he could reap some legal benefit by excluding defense attorneys from the pre-trial process," *id.* at 418, and "attempt[ing] in the police station to impose a penalty on Collazo's choice to remain silent amount[ed] to a serious infringement of Collazo's Fifth Amendment right." *Id.* at 417. The court concluded that "Officer Destro's overreaching behavior violated not only Miranda, but also the general Constitutional prohibition against coercive interrogation practices likely to result in involuntary responses." *Id.* at 419.

Because it was clearly established, prior to McNally's interrogation, that denigrating the role of counsel and threatening to impose a penalty on a suspect's exercise of his Fifth Amendment rights constitutes coercion violating the Fifth Amendment, Officers Cooper and Talbot are not entitled to qualified immunity. I therefore concur in the judgment affirming the denial of qualified immunity.

---

4. It was clearly established law in 1993 that a detective during interrogation cannot threaten a suspect with harsher treatment as a result of a suspect's decision to remain silent and not cooperate. *See United States v. Tingle*, 658 F.2d 1332, 1336, n. 5 (9th Cir.1981) ("[I]t is permissible for an interrogating officer to represent, under some circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the fifth amendment."). *See also United States v. Guerrero*, 847 F.2d 1363, 1366 & n. 2 (9th Cir.1988) (noting that recommendations of leniency as a result of cooperation are appropriate, but "threatening to inform the prosecutor of a suspect's refusal to cooperate violates her fifth amendment right to remain silent.").